Filed 12/12/25  P. v. Clinciu CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C101199 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 62-177992, 62-181916) |
| v. | |
| ADRIAN TEODOR CLINCIU, | |
| Defendant and Appellant. | |

In three different criminal cases, the People charged defendant Adrian Teodor Clinciu with false imprisonment, stalking, criminal threats, and violating court orders, among other offenses.  After the trial court denied his initial and then a renewed request for pretrial mental health diversion under Penal Code section 1001.36, he pleaded no contest in two of the cases and was convicted by a jury in the third.[1]  On appeal, Clinciu contends that the trial court abused its discretion in ruling that he was unsuitable for pretrial diversion.  He also asserts that the court should have stayed under section 654 the sentence imposed on two of the convictions.  We affirm the judgment.

---

[1]  Undesignated statutory references are to the Penal Code.

1

BACKGROUND

The present appeal involves three criminal cases filed against Clinciu. First, in case No. 62-177992, Clinciu was charged with false imprisonment by menace (§ 236; count one), misdemeanor resisting a peace officer (§ 148, subd. (a)(1); count two), stalking (§ 646.9, subd. (a); count three), stalking in violation of a temporary restraining order (§ 646.9, subd. (b); count four), and two counts of misdemeanor disobeying a court order (§ 166, subd. (a)(4); counts five and six). The People further alleged that, at the time of the incidents underlying counts three and four, Clinciu was out on bail in a previous unrelated case (§ 12022.1).

Second, in case No. 62-181916, Clinciu was charged with three counts of criminal threats (§ 422; counts one, two, and three), one count of resisting an executive officer (§ 69, subd. (a); count four), one count of misdemeanor exhibiting a deadly weapon (§ 417, subd. (a); count five), and one count of vandalism (§ 594, subd. (b)(1); count six). The People also alleged that, as to all but count five, Clinciu was out on bail in case No. 62-177992 at the time of the offenses (§ 12022.1).

Third, in case No. 62-182117, Clinciu was charged with seven counts of misdemeanor violating a protective order (§ 273.6, subd. (a)).[2]

I.

In August 2022, Clinciu moved for pretrial mental health diversion under section 1001.36. Clinciu's moving papers and exhibits, along with the People's opposition, described the events underlying the charges filed in all three cases as well as Clinciu's mental health history.

---

[2] Because case No. 62-182117 is not before us in this appeal, copies of the charging documents in that case are not part of the present record. We rely on the consistent description of those charging documents by the parties and the trial court.

## A.

With respect to the events underlying the criminal cases, the charges filed in case No. 62-177992 stemmed from two separate sets of incidents. First, one night in early December 2020, Clinciu was arrested at his home after holding a female friend there against her will and fighting with responding officers. The victim told police that she and Clinciu had been planning to go to the mall, and she fell asleep at Clinciu's house while he was getting ready. She awoke to Clinciu talking to himself and screaming. When she asked Clinciu to take her home, he responded, " 'you're not going anywhere. You are not leaving.' " He told her, " 'you are going to get it the hard way.' "

As the victim started texting her sister for help, Clinciu followed her around the house, hovering over her. The victim noticed a knife on a table that had not been there before and believed Clinciu had placed it there to intimidate her. When the victim attempted to leave, Clinciu stood between her and the door, holding it shut and becoming very angry. The victim's sister called police; they responded and forced entry into the house. Clinciu struggled against the multiple officers trying to restrain him and was eventually subdued with the help of a police K-9. Clinciu admitted to officers that he had "mentally" trapped the victim and that this was wrong. He also told them that he "drank beer all day long and vaped THC."

Regarding the second set of incidents underlying case No. 62-177992, a few days before being arrested at his house, Clinciu was fired from a dental office where he had been working as a dentist. According to the office's regional manager, Clinciu's behavior had become " 'so erratic she felt the staff and patients could be at risk of harm.' "

Shortly after being fired, Clinciu sent numerous text messages to the regional manager. She perceived them as threatening and reported them to the police. The messages said: " 'I was put through hell because of [another individual] and [the regional manager]' "; " 'your time will come to an end, and you will have to answer to your

3

bullshit you had done' "; and " '. . . [j]ust be civil and don't force my hand against you guys.' " Approximately ten days later, Clinciu sent additional text messages to employees of the dental office, including statements such as, " 'Barked up the wrong tree. Should have done your homework before you hired me!!' " and " 'Warn [a named doctor] and the CEO, there is whole lot of headache coming their way soon!' "

The following month, in January 2021, Clinciu again contacted the regional manager, who was encouraged to seek a workplace violence restraining order when she reported it to police. After receiving another call from Clinciu, the regional manager (through her employer) sought and obtained a restraining order, which was served on Clinciu in late February 2021.

Four days after being served with the restraining order, Clinciu again texted the regional manager. The following day, officers responded to a report that Clinciu was violating the restraining order by coming within 100 yards of the dental office. When officers arrived, Clinciu was drinking a beer and was "clearly intoxicated." Clinciu claimed that he had not read the restraining order and said that he " 'gets restraining orders all the time from women who are crazy.' " The dental office employee who reported Clinciu's presence told police that Clinciu had driven by the office one or more times per week, but those instances were not reported to law enforcement.

Clinciu was arrested and, with his consent, officers searched his car. They located a laptop bag, which contained a series of handwritten pages under the title of "Fuckery Rule Book." (Some capitalization omitted.) These pages, which were attached to Clinciu's diversion motion, listed a series of numbered statements, including: "BLOW JOBS are FREE"; "You have .0001 sec to say no to Dick in mouth & Ass (Boys Only)"; "NO use of the word RAPE"; "Grab HER BY HER PUSSY!"; and "You can FORFIET [*sic*] or SELL PROPERTY (Women)!"

On the way to jail, Clinciu "berated" and insulted the transporting officer. Clinciu remained in custody until mid-April 2021, when he was released on bail.

4

The charges in case No. 62-181916 stemmed from Clinciu's actions several months later, in early October 2021. Police responded to reports of Clinciu cursing, yelling, and using a chainsaw to cut down his own trees and those of his neighbors. It was also reported that the previous day, Clinciu responded to a letter he had received from a neighbor by leaving the letter lodged in a tree with an axe. When officers approached Clinciu, he became hostile and confrontational and told them, " 'Get the fuck out of here!' " Clinciu was armed with a knife and had access to a chainsaw, axe, shovel, and various other objects. He threatened to throw rocks at the officers if they did not go away, and the officers decided to leave to de-escalate the situation.

Later the same day, officers were again dispatched to the same location following a report that Clinciu was threatening people with a shovel and chainsaw. The responding officers watched several cell phone videos of Clinciu's encounters with multiple victims. One victim had video of Clinciu holding a shovel, asking the victim what he was doing in the neighborhood and telling him to leave before walking away dragging the shovel along the ground. Clinciu stopped another victim who was driving with his window open. Clinciu held a chainsaw, with its engine running, within a foot or two of the victim's head. Clinciu told this victim, " 'If you live here in the neighborhood, have a Happy Halloween. I am going to find you. Just wait for Halloween. I am going to find you.' " Clinciu then continued to walk down the middle of the street, stopping other cars with his chainsaw in hand, asking drivers why they were in the neighborhood, and yelling at them to " 'get the fuck out of the neighborhood.' " One victim was reportedly "overwhelmed by how many people [Clinciu] was accosting while holding the chainsaw." During this episode, Clinciu was seen drinking a beer and appeared intoxicated; officers located numerous empty beer cans in front of his house. Clinciu later reported that he had been using mushrooms daily prior to this incident and had been drinking and smoking marijuana that day. Following these events, Clinciu was taken into custody.

5

Finally, with respect to the charges in misdemeanor case No. 62-182117, around the same time as the chainsaw incident, Clinciu's former wife reported that Clinciu was violating the terms of a domestic violence restraining order. She told police that, in late September 2021, Clinciu had driven down the street where she and their children lived and that, the day after the chainsaw incident, he had called her approximately five times from the county jail but she did not answer the phone. Clinciu's former wife reported that Clinciu was not to come within 100 yards of her, their home, or their children outside of his supervised parenting time, which had recently been revoked.

Following the chainsaw incident, Clinciu remained in custody for two months before again being released on bail in early December 2021.

B.

The papers submitted with Clinciu's motion for mental health diversion also described his mental health history. In April 2022, Dr. Eugene Roeder performed a psychological evaluation of Clinciu and prepared a report, which Clinciu attached in support of his motion. According to Dr. Roeder, Clinciu reported having started therapy after his release from custody in December 2021 and had been diagnosed with bipolar disorder. Psychiatric progress notes from December 2021 through February 2022 were also attached to the diversion motion. A progress note from late February 2022 stated that Clinciu "convincingly denies suicidal ideas" and "[t]here are no assaultive or homicidal ideas or intentions."

Dr. Roeder reported that Clinciu had been prescribed a combination of mood-stabilizing, tranquilizing, and antidepressant medication, which he was continuing to take regularly "with good results." Clinciu was reportedly continuing psychiatric care and seeing a therapist regularly. Dr. Roeder opined that Clinciu was "experiencing the symptoms of a severe mental disorder" and that his current treatment was both "appropriate and effective." Dr. Roeder felt that "if he continues to participate in these

6

interventions, his medications remain appropriate and successful, and he avoids a return to substance abuse, he has a good prognosis for avoiding future similar difficulties."

Also attached to Clinciu's diversion motion was a 2015 psychological evaluation, conducted pursuant to a family court referral, regarding Clinciu's capacity for unsupervised visitation with his minor children. The evaluation detailed a series of allegations that Clinciu's then-wife had made against him. She described their marriage as peaceful until August 2014 when Clinciu exhibited "a sudden change in his personality and behavior." He began cursing a lot and drinking alcohol heavily at home, and he purchased three new cars in September 2014. In November 2014, their mutual friends confronted Clinciu about his behavior, and after the friends left, Clinciu told his wife that he would "hit her so hard that he would not need to hit her again." He then reportedly shoved her against a wall and put his hands around her throat. In early December 2014, Clinciu cursed at his wife and "threatened her with violence." He stated that "women are crazy and need to be put in [their] place with force," while punching his fist into his other hand. He took away her keys and phone to keep her from leaving the house.

In a separate incident that Clinciu's then-wife described, in mid-December 2014, he "aggressively disciplined" their young son "for being cranky." Clinciu said that he was entitled to rule over everything and told his wife to be quiet and submissive. When his wife disagreed, Clinciu "reportedly became angry and threatened to hit [his wife] so hard that she would hit the walls and would never wake up." He also "reportedly grabbed his wife and dragged her out of the room and up the stairs to put [her] in a time out." She eventually fled the house. In January 2015, Clinciu's wife saw that Clinciu had made a large purchase at a gun store and heard from a relative that Clinciu had said he was going to "get guns and shoot everyone except the children." Although Clinciu denied these allegations during the 2015 assessment, he later told Dr. Roeder that the events described by his ex-wife were substantively true. The 2015 psychologist stated that these reports "suggest[ed] that [Clinciu] may have been experiencing a manic

7

episode beginning in mid August of 2014" and "could indicate a Bipolar Disorder." The psychologist, however, could not make a "definitive diagnosis" because Clinciu was evasive and defensive regarding his symptoms and behavior.

## II.

At an April 2023 hearing on Clinciu's diversion motion, Dr. Roeder testified. He testified that Clinciu's behavior during the October 2021 chainsaw incident—the only incident for which Dr. Roeder had reviewed a police report—was "quite consistent with that of someone who is in the manic phase of a bipolar disorder." Dr. Roeder confirmed that Clinciu's mental health was a significant factor in those events. He opined that Clinciu had bipolar disorder and said the testing also indicated an "alcohol use disorder," which was "comorbid with his bipolar disorder." Dr. Roeder testified that, as of the April 2022 evaluation, after participating in and benefitting from treatment, Clinciu had maintained sobriety and had not had any incidents. Dr. Roeder also explained that, for most individuals, manic episodes occur annually or every other year, though they can occur more frequently.

Dr. Roeder further opined that Clinciu was amenable to treatment and was suitable for mental health diversion. As to Clinciu's potential danger to society if granted diversion, Dr. Roeder felt the risk was "low" if he was participating in treatment. But the risk would "increase if he were to not be participating in treatment and were to return to substance abuse." If Clinciu were to resume using mushrooms, marijuana, and alcohol, it would "increase the likelihood [that] he would have a resumption of his severe mental illness symptoms," and he would likely revert to the behavior exhibited in 2021. Participating in treatment would "significantly lessen" the likelihood that Clinciu would "relapse into substance abuse," because Clinciu's prior "substance abuse was primarily a form of self-medication of his underlying psychiatric difficulties." Dr. Roeder was not aware of what treatment Clinciu was receiving at the time of the hearing, because he had not had contact with Clinciu since the April 2022 evaluation.

8

At the close of the hearing, the victim of the December 2020 false imprisonment gave a statement regarding the emotional harm she suffered from that event. She described having nightmares involving the knife that Clinciu placed on the center of the kitchen island; she explained that, on the night of the incident, she was afraid he would never have let her leave if the police had not broken down the door.

A few weeks after the hearing, the trial court issued a written ruling denying Clinciu's motion. The court found that Clinciu was eligible for diversion because his bipolar disorder was both a qualifying disorder and a significant factor in the commission of the charged offenses. (See § 1001.36, subd. (b)(1) & (2).) The court stated that, although alcohol abuse played a role in the charged crimes, Clinciu's bipolar disorder was a significant factor.

As to his suitability for diversion, the trial court found that Clinciu had provided an opinion of a mental health expert (Dr. Roeder) that his symptoms would respond favorably to treatment. Clinciu had also consented to diversion, waived his speedy trial right, and agreed to comply with treatment. (See § 1001.36, subd. (c)(1)-(3).)

Regarding the final suitability factor, the trial court found that Clinciu had not established that he would not pose an unreasonable risk of danger to public safety if treated in the community. (§ 1001.36, subd. (c)(4).) The court recounted Clinciu's conduct underlying all three criminal cases, including the " 'Fuckery Rule Book' " found in Clinciu's car, and summarized the allegations recited in the 2015 psychological evaluation. The court acknowledged the February 2022 progress note that reported no assaultive or homicidal ideation. The court also gave "significant weight" to Dr. Roeder's opinion that Clinciu had a good prognosis and a low risk of dangerousness if he avoided substance abuse and continued treatment and medication. The court further acknowledged that Clinciu had been a "productive member of society" as a dentist for several years, had no prior criminal convictions, apparently had displayed no threatening conduct before August 2014, and was currently participating in treatment. The court

9

nevertheless concluded that, "considering the serious nature of the alleged circumstances charged in this case, the history of substance abuse, the history of violating court orders, the defendant's past conduct involving his ex-wife in 2014, and the nature of the defendant's mental health disorders, . . . the evidence d[id] not establish that the defendant would not pose an unreasonable risk of committing homicide or attempted homicide if treated in the community on a pretrial mental health diversion program." And even if suitability had been shown, "the court, in its discretion, would have denied diversion given the serious circumstances of the case related to public safety and the safety of the victims."

In late July 2023, the prosecution moved to revoke Clinciu's bail after learning that he had allegedly filtered a bribe to the false imprisonment victim to discourage her from testifying at the upcoming trial. The trial court denied the request, instead converting Clinciu's bail status to supervised bail. Among other things, the court imposed "the highest level of GPS monitoring possible by the probation department."

In early September 2023, Clinciu was arrested for violating the terms of his release by driving past his former employer's dental office. His bail was revoked on a finding that he had not complied with less restrictive alternatives and was "a danger to the community." Clinciu remained in custody for the remainder of the proceedings.

III.

In mid-September 2023, Clinciu filed a renewed motion for mental health diversion based on new information related to his risk of dangerousness. Several exhibits were attached to the motion. First, Clinciu attached a supplemental evaluation performed by Dr. Roeder in August 2023. In the evaluation, Dr. Roeder reported that Clinciu had been stable on the same medications for almost two years and had not used any substances since his October 2021 arrest. Dr. Roeder opined that, while Clinciu "has numerous historical violence factors present," a clinical risk assessment test indicated a "low risk of future violence, a low risk of serious physical harm, and a low risk of any

10

imminent violence." The report acknowledged that Clinciu "clearly has a history of violent, antisocial, threatening and substance abuse behavior in 2020 and 2021," but found that Clinciu's "risk of future violence [wa]s low despite this reality because of the treatment in which he has participated since that time and his clinical response to this treatment, which has been positive." Further, while noting that Clinciu was "vulnerable" to relapse into substance abuse, Dr. Roeder opined that Clinciu's "extended period of sobriety combined with his other clinical and risk management factors indicate he has a very good prognosis for continuing to maintain his abstinence from substance use."

Clinciu's renewed diversion motion additionally attached an August 2023 declaration by his treating psychiatrist, Dr. Kevin Hayes. Dr. Hayes stated that Clinciu had not "presented any homicidal or suicidal thoughts" in their conversations. Dr. Hayes opined that, "[a]s long as [Clinciu] is compliant with treatment (medications), he is at a minimal risk of any harm to others." Dr. Hayes could not "discern any homicidal acts." Dr. Hayes further declared that, after conducting a clinical risk assessment, he was of the professional opinion that Clinciu "currently presents no risk of committing murder if he is diverted to Mental Health Court."

A further attachment was a June 2023 letter from the Dental Board of California stating that, after receiving a psychological evaluation from Dr. Hayes, the Board had determined that Clinciu could resume practicing dentistry. The final attachment was a July 2023 declaration from Clinciu's former wife asking that the criminal protective orders barring Clinciu from contact with his children be lifted. She stated that her earlier concerns about Clinciu had been alleviated following his treatment for his bipolar disorder.

In late September 2023, an initial hearing was held on the motion, which the trial court characterized as a motion for reconsideration of the denial of mental health diversion. Because Clinciu's physician witnesses were not available, the prosecution presented testimony from its witnesses first. The victim of the December 2020 false

11

imprisonment testified regarding her experience that night, adding further details about the incident. The victim stated that she had met Clinciu two or three months before the incident and that they would drink all night and smoke marijuana every time they socialized. She said that later in their friendship, they would also consume hallucinogenic mushrooms. They agreed their relationship would not be romantic. Two weeks before the false imprisonment incident, Clinciu sexually assaulted her. The victim had fallen asleep on Clinciu's couch and woke up to him digitally penetrating her.

After two weeks of avoiding Clinciu, the victim agreed that he could take her to the mall, and that led to the events underlying the false imprisonment charge. The victim testified that after she asked Clinciu to take her back to her home, he was "chasing [her] around the house" and trying to grab her cell phone while she was talking to her sister and crying to be picked up. The victim stated that she noticed "a really big knife" on the center of the island table that had not been there before; she said the "huge" knife was the only item on the table. Clinciu looked at the knife, made eye contact with her, and asked her whether she was scared. He then started telling her there was nothing she could do to him, showed her one of his scars from a fight, and told her she was going to learn things the hard way. This all happened with him standing right in front of her as she was shaking in a corner of the kitchen.

One of the victims of the October 2020 chainsaw incident also testified at the September 2023 hearing. This victim testified that Clinciu walked up to the driver-side window of the victim's car in the middle of the street in their residential neighborhood. Clinciu was carrying a running chainsaw and swung it in front of the victim's face while telling him to get out of the car.

The final prosecution witness was Clinciu's former probation officer, who testified regarding Clinciu's September 2023 violation of the terms of his pretrial release. The officer testified that the conditions of Clinciu's release required him to comply with a criminal protective order prohibiting him from coming within 100 yards of his former

12

dental office. One day in September 2023, she received a remote alert from Clinciu's GPS device indicating that he had entered the exclusion zone around the office. Based on the location data she obtained, it appeared that Clinciu had driven past the dental office and slightly into the office parking lot before continuing down the road. Clinciu, who was not living near the office at that time, entered and exited the exclusion zone in less than one minute and was roughly 100 feet from the dental office building. Clinciu was arrested the next day for this violation.

The diversion hearing was continued to January 2024, when Clinciu's witnesses, Dr. Roeder and Dr. Hayes, became available to testify. Dr. Roeder testified consistent with his supplemental evaluation. He further stated that Clinciu had a pattern of experiencing manic episodes every two years and that, despite Clinciu's history of "violent and antisocial behavior," he remained a "particularly appropriate candidate for mental health diversion." Dr. Hayes testified that Clinciu had been a patient of his clinic from December 2021 through August 2023, prior to his latest incarceration. Clinciu had shown continued progress over the course of his treatment and was invested in his care and "getting better." Dr. Hayes agreed with Dr. Roeder's assessment that Clinciu presented a low risk of future violence.

After hearing argument from the parties, the trial court took the matter under submission and issued a ruling from the bench several days later. The court noted that the doctors' opinions were partly based on assumptions that Clinciu was complying with the terms of his release when, in fact, he had been arrested for violating those terms. The court concluded: "[C]onsidering that and all the other information the [c]ourt identified, the totality of the evidence in this case, the motion for reconsideration is denied."[3]

---

[3] Clinciu unsuccessfully sought review of the denial of diversion by writ in this court. (*Clinciu v. Superior Court*, case No. 100690.)

13

IV.

Case No. 62-177992, involving the false imprisonment and stalking charges, proceeded to trial, and in March 2024, a jury convicted Clinciu on all six counts. Clinciu later admitted the section 12022.1 on-bail enhancement.

The following month, Clinciu entered pleas of no contest to the first count (criminal threats, § 422, subd. (a)) in case No. 62-181916 and to the first count (misdemeanor violation of a protective order, § 273.6, subd. (a)) in case No. 62-182117. At the People's request, the trial court dismissed the remainder of the counts and allegations in both of these cases.

After a hearing, the trial court imposed sentence in all three cases. In case No. 62-177992, the court sentenced Clinciu to 16 months in prison for the false imprisonment in count one (the low term), a consecutive term of one year for the stalking in violation of a temporary restraining order in count four (one-third the middle term), a concurrent term of 16 months for the stalking in count three (the low term), and concurrent terms of 30 days for the misdemeanors charged in counts two, five, and six. The court also imposed a consecutive two-year term for the admitted section 12022.1 on-bail enhancement, for an aggregate prison term of four years four months. Consistent with his plea agreement, Clinciu was sentenced to a concurrent term of 16 months for the single count of criminal threats in case No. 62-181916 and a concurrent term of 30 days for the misdemeanor violation of a protective order in case No. 62-182117.

Clinciu filed timely notices of appeal in all three cases. The appeal from Clinciu's no contest plea in misdemeanor case No. 62-182117 was commenced in the appellate division of the superior court, while the present appeal from the other two cases proceeded in this court. (See *People v. Nickerson* (2005) 128 Cal.App.4th 33, 36 [Court of Appeal has appellate jurisdiction over appealable orders in felony cases, while appellate divisions of superior courts have appellate jurisdiction over appealable orders in misdemeanor cases]; §§ 1235, subd. (b), 1466; Cal. Const., art. VI, § 11.) We denied

14

Clinciu's request to consolidate the misdemeanor appeal with the present appeal, without prejudice to either party seeking transfer from the appellate division following its disposition of the misdemeanor appeal. (See Cal. Rules of Court, rule 8.1006.) With our permission, Clinciu belatedly sought and obtained from the trial court a certificate of probable cause in case No. 62-181916. (See *People v. Robinson* (2024) 100 Cal.App.5th 133, 136 [certificate of probable cause required to challenge denial of mental health diversion before guilty plea].)

## DISCUSSION

## I.

Clinciu contends that the trial court abused its discretion by denying his initial and renewed requests for pretrial diversion under section 1001.36. First, he argues that there was insufficient evidence to support the court's determination that he was at risk of committing a super strike offense if treated within the community. Second, he claims that in denying diversion, the court impermissibly relied on his substance use disorder. Finally, he argues that the court failed to consider the legislative goals of the diversion statute.

## A.

To obtain pretrial mental health diversion, a defendant must show that he or she is both "eligible" and "suitable" for diversion. (§ 1001.36, subds. (b), (c) & (e); *People v. Bunas* (2022) 79 Cal.App.5th 840, 859-860.) A defendant is "eligible" for diversion if he or she has been diagnosed with a mental disorder that "was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1) & (2).) A defendant is "suitable" for diversion if the defendant's symptoms would respond to mental health treatment, the defendant consents to diversion and waives the right to a speedy trial, the defendant agrees to comply with treatment as a condition of diversion, and the "defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)-(4).) Under

15

section 1170.18, subdivision (c), an " 'unreasonable risk of danger to public safety' means an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667."  Those violent felonies, commonly referred to as "super strikes," include homicide, attempted homicide, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, and any sexually violent offenses or sexual offense committed against minors under the age of 14.  (§ 667, subd. (e)(2)(C)(iv); *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1150-1151 (*Whitmill*).)  In determining whether a defendant poses an unreasonable risk of danger to public safety, the trial court "may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (c)(4).)

We review the trial court's decision to deny mental health diversion for abuse of discretion.  (*People v. Graham* (2024) 102 Cal.App.5th 787, 795.)  " 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence.' "  (*Ibid.*)  The fact that reasonable minds may differ as to the appropriate resolution of an issue does not demonstrate an abuse of discretion.  (*People v. Clair* (1992) 2 Cal.4th 629, 655.)  Nor does the existence of contrary evidence provide a basis to supplant a trial court's supported findings.  (See *People v. Brown* (2024) 101 Cal.App.5th 113, 123-124; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1086.)

## B.

Applying this standard to Clinciu's first assertion of error concerning the denial of his initial diversion request, we perceive no abuse of discretion in the trial court's

16

conclusion that Clinciu failed to show that he did not pose an unreasonable risk of committing a super strike offense. The record before the trial court demonstrated that Clinciu repeatedly committed serious and violent offenses against numerous victims over the span of nearly one year. He held a friend in his home against her will, intimidated her with a knife, and threatened that she was " 'going to get it the hard way.' " He harassed his former manager and colleagues with threatening messages, leading them to obtain a restraining order against him. In another incident, he accosted numerous people in his neighborhood with a chainsaw—in one instance, holding the running chainsaw within a foot or two of a victim's head while threatening to "find" the victim on Halloween. It is true that Clinciu was not charged with a super strike. But from the violent and threatening circumstances of these offenses—including bringing a running chainsaw near a person's face—the trial court could reasonably infer there was a significant danger that Clinciu could commit homicide or attempted homicide "and therefore posed an unreasonable risk under section 1001.36, subdivision (c)(4)." (*People v. Brown*, *supra*, 101 Cal.App.5th at p. 124; see *People v. Bunas*, *supra*, 79 Cal.App.5th at p. 862 [trial court may rely "primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion"]; *People v. Hall* (2016) 247 Cal.App.4th 1255, 1266 [absence of prior or current super strike not dispositive].)

Beyond the conduct underlying the charged offenses, the trial court also had before it Clinciu's history of domestic violence. In a series of incidents in late 2014, Clinciu reportedly threatened to severely injure or kill his then-wife, for instance, vowing to hit her so hard she "would never wake up" and choking her against a wall on another occasion. He also was reported to have made a large purchase at a gun store after threatening to "shoot everyone except the children." Further, the "Fuckery Rule Book" found in Clinciu's car and specifically referenced in the trial court's written ruling contained statements glorifying domination of and violence against women. (Some capitalization omitted.) These statements could reasonably solidify the court's concern

17

that Clinciu's violent actions against women would continue and intensify. (See *Whitmill*, *supra*, 86 Cal.App.5th at pp. 1150-1151 [sexually violent offenses are super strikes]; § 667, subd. (e)(2)(C)(iv)(I); Welf. & Inst. Code, § 6600, subd. (b).)

Clinciu argues that the charged offenses were not "particularly egregious." He questions the credibility of certain witnesses and emphasizes what he did not do to the victims in these cases. On appeal, however, it is not our role to reassess credibility determinations; and the applicable standard of review requires us to uphold a trial court's findings if there is substantial evidence supporting them. (*People v. Gerson*, *supra*, 80 Cal.App.5th at p. 1086 [appellate court could not reweigh evidence to overturn trial court's determination that defendant failed to establish his eligibility for diversion]; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 ["A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question"].) Here, as we have explained, there was substantial evidence of his dangerous and violent conduct.

Clinciu further argues that he established he was not an unreasonable risk to public safety because his condition was responding well to treatment and he had not reoffended since being treated. While a fact finder could reasonably conclude that Clinciu was no longer an unreasonable risk to public safety because he had since received medication and treatment and had not engaged in further criminal acts, the record does not compel such a finding. To the contrary, the information before the trial court also supported the view that Clinciu's then-recent period of law-abiding behavior and participation in treatment did not outweigh the risk of him relapsing into substance abuse that would, in Dr. Roeder's words, "likely" cause him to revert to the extreme behavior exhibited in 2021. And while there was testimony that Clinciu had maintained sobriety throughout his period of release, there was no testimony or argument that he had participated in therapy specific to addressing his comorbid alcohol use disorder. Further, Dr. Roeder's

18

view of the efficacy of Clinciu's roughly four months of treatment was undercut by the fact that, as the trial court noted, the doctor had not conducted a specific risk assessment for violence and had not considered any police reports of Clinciu's conduct other than the October 2021 chainsaw incident report.

We are also unpersuaded by Clinciu's reliance on three cases in which Courts of Appeal found insufficient evidence of unreasonable risk to public safety: *Whitmill*, *supra*, 86 Cal.App.5th 1138, *People v. Williams* (2021) 63 Cal.App.5th 990, and *People v. Moine* (2021) 62 Cal.App.5th 440. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) In any event, those three cases involved circumstances different than those here. *Whitmill* addressed the "unusual scenario" of the defendant "running away from further confrontation, throwing away his firearm, and peacefully complying" with law enforcement after firing a single shot in the air in a single incident. (*Whitmill*, at p. 1151; see *id.* at pp. 1142-1143.) In *Williams*, the defendant issued "horrific threats" to his victims through e-mails and letters, but "never actually assaulted anyone or engaged in any violence." (*Williams*, at p. 1003; see *id.* at pp. 993-994.) And in *Moine*, the defendant got into a fistfight with another patient at an urgent care facility and a year later threatened to shoot everyone in another urgent care center. (*Moine*, at pp. 444-445.) There was no evidence that the defendant in *Moine* possessed or had access to firearms, and he profusely apologized immediately after making the threats. (*Id.* at p. 445, fn. 2.)

In contrast here, Clinciu engaged in repeated and violent acts. He wielded a deadly weapon, a running chainsaw, close to the face of a passerby while threatening to come find him later. He held a woman against her will and intimidated her with a knife. And he fought with the officers who eventually subdued him on the night of the false imprisonment incident and was hostile toward the officers who confronted him during the chainsaw incident and those who arrested him near the dental office. All of this occurred

19

against the backdrop of Clinciu's physical violence against his wife some years before and his possession of a "Rule Book" advocating the mistreatment of women. (Some capitalization omitted.)

We likewise find no merit in Clinciu's additional contention that the trial court erred in its consideration of his substance abuse. Clinciu argues that the court incorrectly determined that his substance use disorder "precluded him from relief." The record belies this claim, because the court's ruling found Clinciu eligible for diversion, even while finding that alcohol abuse apparently "played a role in the charged crimes." Clinciu is also mistaken in arguing that the trial court improperly considered his substance abuse as part of its evaluation of his likely dangerousness. Under section 1001.36, a trial court may consider "any other factors that [it] deems appropriate" in determining whether a defendant poses a risk of committing a super strike. (§ 1001.36, subd. (c)(4).) And here, Clinciu's own expert psychologist tied Clinciu's risk of reoffending to his ability to avoid substance abuse.

Last, Clinciu argues that the trial court failed to consider the legislative goals behind the diversion statute. (See *People v. Frahs* (2020) 9 Cal.5th 618, 631 [diversion statute's purpose is " 'to promote . . . [¶] . . . [i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety," quoting § 1001.35, subd. (a)].) But "[a]bsent evidence to the contrary, we presume that the trial court knew the law and followed it." (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) Here, we see no affirmative evidence in the record that the trial court misunderstood the Legislature's objective of promoting mental health diversion when it concluded that Clinciu was not suitable for diversion.

C.

Clinciu presses the same arguments in challenging the trial court's denial of his renewed motion for mental health diversion. The supplemental evidence and argument

offered in connection with that motion, however, give us no reason to reach a different conclusion.

In support of his renewed motion in August 2023, Clinciu submitted a supplemental evaluation by Dr. Roeder that included a clinical risk assessment indicating a low risk of future or imminent violence. Clinciu also presented both testimony and a declaration from his treating psychiatrist, Dr. Hayes, concurring with that assessment. There was evidence as well that Clinciu had continued to maintain his sobriety and that, by the time of the January 2024 hearing, he had apparently gone more than his usual "pattern" of two years without a manic episode, none having been reported by then. At the same time, the prosecution presented additional evidence of its own, offering further details of the false imprisonment incident and newly informing the trial court of the sexual assault Clinciu perpetrated on this same victim. The prosecution also offered evidence that—after both doctors' submissions—Clinciu violated the terms of his supervised pretrial release by going near his former dental office notwithstanding the workplace violence restraining order. The trial court considered this evidence and discounted the doctors' opinions as based on the since-disproved assumption that Clinciu was complying with the terms of his release and denied the renewed motion in light of the "totality of the evidence."

Clinciu maintains that this conclusion amounted to an abuse of discretion in light of the new evidence before the trial court. He argues, for example, that he was in the exclusion zone for only one minute and that the testimony was inconclusive as to whether he turned into the dental office parking lot. The trial court was not obligated to view his conduct so generously. Rather, the court could reasonably view Clinciu's return to the site of his previous stalking and restraining order violation charges—a return that the probation officer's testimony confirmed would not have been accidental, as Clinciu no longer lived in that area—as evidence of a willingness to violate court orders and an indication of his risk of reoffending.

21

Moreover, contrary to Clinciu's argument, other relevant evidence was presented at the hearing on his renewed motion—notably, evidence that he had committed sexual assault against the victim of his false imprisonment. This evidence too reasonably supported the trial court's determination that the record, when viewed in its entirety, showed an unreasonable risk that Clinciu would commit a super strike.

Considering all the evidence before the trial court by the time of the renewed motion, we cannot say it was an abuse of discretion for the court to find that Clinciu had failed to establish that he did not pose an unreasonable risk of committing a super strike, even if reasonable minds could differ on the question. (See *People v. Brown*, *supra*, 101 Cal.App.5th at p. 124.)

## II.

Separate from the diversion issue, Clinciu contends that, under section 654, the trial court was required to stay his sentence on two of the three convictions for counts four, five, and six in case No. 62-177992. These were the convictions for stalking the regional manager of the dental office in violation of a temporary restraining order (§ 646.9, subd. (b); count four), misdemeanor disobeying a court order by contacting that same regional manager (§ 166, subd. (a)(4); count five), and misdemeanor disobeying a court order by failing to stay 100 yards away from the dental office (§ 166, subd. (a)(4); count six). The trial court imposed a one-year term for the stalking in count four and concurrent terms of 30 days for counts five and six. The court did not refer to section 654 in pronouncing sentence.

Section 654, subdivision (a) provides that "[a]n act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." The statute prohibits multiple punishments when a defendant is convicted of more than one crime based on a single act or omission. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) It also bars multiple punishments for convictions arising out of a

22

"course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)

" 'A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence.' " (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94.)  "We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Clinciu argues that the convictions in counts four, five, and six implicate section 654 because they were all based on his presence within 100 yards of the dental office on March 2, 2021.  That is incorrect as a factual matter because Clinciu was charged and convicted on count five for disobeying a court order by "contacting" the regional manager, based on a text message he sent to her after being served with the restraining order.  The count five conviction was not based on his presence in any particular location.

In considering whether section 654 nonetheless bars punishment for any pair of these three offenses, we begin by ruling out that section's application to counts five and six in relation to each other.  Count six, like count five, was for disobeying a court order (§ 166, subd. (a)(4)), with count five based on Clinciu's text message to the regional manager and count six based on him coming within 100 yards of the dental office on or about March 2, 2021.  Because counts five and six were convictions for violations of the same criminal statute by different conduct, section 654 does not prohibit their separate punishment in relation to each other.  (*People v. Correa* (2012) 54 Cal.4th 331, 337 ["the express language of section 654 applies to an act that is punishable in *different* ways by *different* provisions of law"]; see *id.* at p. 340 ["Both the language and purpose of section 654 counsel against applying it to bar multiple punishment for violations of the *same* provision of law"].)

23

That leaves the question of whether section 654 prohibits multiple punishment for either or both of the count five or count six convictions in relation to the stalking conviction in count four. Notwithstanding the prosecution's contrary position at sentencing, the People argue in this appeal that the count four stalking conviction rested on different acts with different objectives than each of counts five and six. The trial court implicitly found as much. (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468 ["the imposition of concurrent terms is treated as an implied finding that the defendant bore multiple intents or objectives, that is, as a rejection of the applicability of section 654"].) We must uphold this implied finding if it is supported by substantial evidence (*In re Raymundo M.*, *supra*, 52 Cal.App.5th at p. 94), "presum[ing] the existence of every fact the trial court could reasonably deduce from the evidence" (*People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143). Further, it is an appellant's burden to "affirmatively demonstrate prejudicial error." (*People v. Garza* (2005) 35 Cal.4th 866, 881.) Here, Clinciu has not met his burden of establishing the factual premise of his section 654 argument. We have already explained the inaccuracy of his lone factual contention that all three convictions were based on his presence within 100 yards of the dental office on March 2, 2021. And Clinciu offers no other discussion or citation of relevant portions of the record that might support his position that the convictions in counts five and six rest on the same conduct as that in count four. Accordingly, we have no basis on which to disturb the trial court's decision to impose sentence on each of counts four, five, and six.

## DISPOSITION

The judgments are affirmed.

/s/
FEINBERG, J.

We concur:

/s/
EARL, P. J.

/s/
RENNER, J.